The next case on our docket is Agenda No. 22, No. 129081, Lucille Mosby v. The Ingalls Memorial Hospital. We were told this morning that the attorneys for the appellants will be splitting their time equally, 10 minutes for each. Are you prepared to begin? Yes, good morning. May it please the Court, my name is Bonnie Delgado, and this appeal concerns interpretation of the Biometric Information Privacy Act's carve-outs for certain uses in the health care setting. Both of these consolidated cases concern health care workers' use of automated dispensing cabinets to access medications and medical supplies to treat patients. And at bottom, the question before the Court is whether two separate categories of information, separated by a disjunctive or, cover different types of data. The language of the statute says, biometric identifiers do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the Health Insurance Portability and Accountability Act of 1996, or HIPAA. Now this Court has had several occasions over the past several years to interpret the Privacy Act. Beginning with Rosenbach v. Six Flags and continuing on through Cothran v. White Castle, there are two critical lessons that flow from this Court's cases that control the analysis today. First and foremost, every one of those cases has made clear that when interpreting the Privacy Act, just as when interpreting any other Illinois statute, the focus of the analysis is on the language that the legislature gave us. And the second takeaway that flows from those Privacy Act cases is that when interpreting the Privacy Act, just as when interpreting any other Illinois statute, this Court's ordinary canons of construction apply in the same manner to this statute as they do to any others. So with that focus, I want to return again to the language that the legislature gave us. To the extent it's helpful to see the language as we're discussing it this morning, it's available on page 11 of our opening brief as well as on A2 of the appendix beginning 10 lines down from the top of the page. And the language that we're looking at says biometric identifiers do not include information captured from a patient in a healthcare setting or information collected, used, or stored for healthcare treatment, payment, or operations under HIPAA. That language that the legislature gave us includes the word information twice, setting up two separate categories of information that are included within this sentence. And those two separate categories of information are separated with the word or, further demonstrating that these are two different and separate alternatives contained within this sentence. The first exclusion, the patient data exclusion, focuses on the source of the information. And we know this because the legislature used the word from in that exclusion. Information from a patient in a healthcare setting. The second exclusion, the healthcare exclusion, focuses on the purpose for the information. And we know this because the legislature used the word for. Information collected, used, or stored for healthcare treatment, payment, or operations under HIPAA. Plaintiffs are urging... So what does operations mean in that context? Operations derives its meaning from the HIPAA statute and regulations. In the context of this appeal, providing medications to healthcare workers, provision of medications to patients would qualify for healthcare treatment, payment, or operations. Through the statute? The statute explains that? The statute uses the phrase under HIPAA at the end of the sentence. Under HIPAA is a propositional phrase. So under both the last antecedent rule or ordinary English grammar, the phrase under HIPAA is modifying the portion of the sentence that it's located closest to. So operations under HIPAA, what does that mean? Obviously we understand the facts here. The nurse has to use her fingerprint to unlock the cabinet where the medications are, right? Yes. So, query, the issue here is, does that fall under operations? You say operations under HIPAA is a specific term. Why does that act not fall under, that conduct fall under operations under HIPAA? We think the most clearest application in this case is treatment under HIPAA because we're talking about accessing medications and medical supplies to treat patients. It could also fall under operations under HIPAA. Looking more deeply at the record in this case, there were declarations submitted on the motion that talked about how these medication dispensing systems are also used to create audit trails to prevent, for example, medication abuse, diversion. And all of those kind of activities conducted by a healthcare provider would fall under operations under HIPAA. So we think the even clearer application here is treatment under HIPAA. Now, looking at the function of under HIPAA in that sentence, there's no rule of either statutory construction or English grammar that would allow the phrase under HIPAA to modify the entire sentence. Under HIPAA modifies the sequence of words that follow the word for healthcare treatment, payment, or operations. And this court's earlier Privacy Act cases have indicated that where a term in a statute is undefined, such as the word under here, an appropriate place to look is Merriam-Webster's Dictionary. So turning to Merriam-Webster's Dictionary, the definition provided for the word under is subject to the guidance, control, instruction, or authority of. The example given for that definition is under the terms of a contract. And when you look at the sentence that we're interpreting today, the phrase under HIPAA is like the phrase under the terms of a contract. The legislature put the phrase under HIPAA in this sentence to tell us that HIPAA guides, controls, instructs interpretation of those words that immediately precede it. Healthcare treatment, payment, or operations. The appellate majority below selected a different definition of under from Merriam-Webster's Dictionary. The definition that they selected is below or beneath, so as to be overhung, surmounted, covered, protected, or concealed by. The examples the dictionary provides for that usage are things like under the sunny skies, under a stern exterior. In other words, that definition is talking about a physical location or attribute. HIPAA is not a physical location or attribute. HIPAA doesn't overhang or surmount or conceal anything. HIPAA guides, controls, informs, instructs the definitions of the terms that immediately precede it. In other words, HIPAA defines them. If the legislature had intended to exempt only information protected under HIPAA, the most natural way for them to do that would have been to simply say, biometric identifiers do not include protected health information under HIPAA. Protected health information is the defined term under HIPAA for information protected by HIPAA. But that's not what our legislature said. If the legislature had intended to limit the healthcare exclusion to only information collected from a patient, the legislature could have ended this sentence at the end of the patient data exclusion. They could have simply said, biometric identifiers do not include information captured from a patient in a healthcare setting, period. But that's not what they said. The legislature gave us the very carefully and thoughtfully crafted healthcare exclusion that is not limited by the source of the information, but focuses on the purpose the legislature used the word for, for healthcare treatment, payment, or operations. Healthcare providers' use of automated dispensing cabinets to access medications and medical supplies to treat patients is unquestionably healthcare treatment under HIPAA. As such, it falls squarely within this exclusion that the legislature has drafted for us. And based on that, it is excluded from coverage under the Privacy Act. We ask that you answer the certified question in the affirmative. Thank you very much. Good morning. Good morning. My name is Matt Wolfe. I represent Becton Dickinson, which is an appellant along with the Northwestern Appellants. Ms. Delgado talked about the language of the statute. I'm going to try not to repeat too much of what she said. I want to provide a little bit more of a practical perspective on how the cabinets work and what we think the legislature intended through the use of the unique language and exclusion. Becton Dickinson manufactures and sells the automated dispensing cabinets that issue in the appeal. They're called med stations. It's a cabinet often about as tall as me. It has a personal computer attached to it. When the nurse or the medical provider wants to treat a patient, they log into the personal computer, look at patient records, figure out what medication needs to be administered, and then their credentials, based on that person's role in the healthcare system, will allow them to open certain drawers. So not everybody can open every drawer. It's all linked together. So there's a component where we're looking at the patient record. There's a component where we're actually taking the medicine out. And then there's a component where we record what happened. That creates an audit trail for patient safety reasons, for fraud and abuse prevention reasons, and for compliance with numerous federal statutes and regulations, as well as regulations issued by other Illinois agencies like the Illinois Pharmacy Board. I don't think there's any dispute that that's healthcare treatment. The penalty actually says in their brief, of course that's healthcare treatment, but that's not what the statute is designed to do. There's also no dispute that biometrics are industry standard at this point. Over the last 15 years, this type of technology has become extremely widely used in the healthcare setting to access medications, to log in and review patient health records, and to take medications, for example, out of the pharmacy and distribute them throughout the hospital. We believe that the legislature foresaw this and designed this language for this purpose. There's three reasons why. First, the text, which Ms. Delgado talked about. Addressing it very briefly, there's two types of information addressed in the text. One is the information captured from a patient and one is the information collected, used, or stored for healthcare treatment, payment, or operations. To Justice Teese's question, to know what treatment, payment, or operations mean, we're not saying, oh, we think it's treatment or operations. We're saying look to the definitions under HIPAA. Look to section 164.501, which is said in our brief. Operations include patient safety activities. That is one of the examples given of operations in the HIPAA regulations. Treatment includes the provision, coordination, and management of healthcare. This is plainly healthcare treatment or operations. There's also a payment component for the tracking purpose. We think it's very clearly healthcare treatment or operations. The legislature used that language on purpose. This court has instructed over and over again, both in the context of the Privacy Act and elsewhere, that we need to apply the legislature's intent and that the best source of the legislature's intent is the words used in the statute. We need to give all parts of the statute meaning and we need to avoid redundancy if possible. And here the natural and ordinary of the reading of the statute avoids redundancy by giving information collected, used, or stored for healthcare treatment, payment, or operations under HIPAA meaning. It does not mean the same thing as the first part of the sentence. Second, I think it's important to consider the context in which the Privacy Act was passed. The Privacy Act was passed in 2008. HIPAA passed in the late 1990s and the federal government issued a series of regulations and guidance after that in the early 2000s. This is addressed in our opening brief between pages 25 and 29. There's a series of regulations and guidance documents cited there. In 2003, I believe, HIPAA issued what's known as the Security Rule. And the Security Rule says healthcare providers, others operating under business associate agreements like vendors, you need to take steps to secure patient information that's being stored electronically now. We're getting past the point. It's 2003. We're getting past the point of paper records. We're storing things on computers. You need to take steps to control access. After that, the Department of Health and Human Services issued a series of guidance papers saying, how do we recommend that you control access? One way of doing that is biometrics. That is specifically mentioned and cited in the guidance papers that we cite at pages 25 and 26 in footnotes 6, 7, and 8. Then the federal government jumped on again in 2008 and said, this was the National Institute of Standards and Technology. It issued a resource guide. It said, how do you implement the HIPAA Security Rule? Use biometrics. There are alternatives, but biometrics is a big one that's in there. We believe that the legislature foresaw this when it passed the Privacy Act in 2008. And if you look at the preamble to the act, it mentions not just the concern and the need for regulation of the Privacy Act, which we agree was animating concern, but another animating concern was protecting the promise of biometric technology for security and other purposes. That's right there in the preamble of the act. The biometrics have promise. They should be regulated. We're going to craft a statute that allows that to happen. And the statute contains other exclusions and carve-outs, not just this one. This one appears in Section 10 in the definition of biometric identifier, which is really a fundamental part of the statute. It tells you what's regulated under the statute. There are other exclusions to Section 10 as well. There are additional exclusions in Section 25, but they don't only appear there. They appear in both places. If the legislature, as Ms. Delgado pointed out, had wanted to say, protected health information only, it knew how to do that. It did that in the Genetic Information Privacy Act. It did that in the AIDS Confidentiality Act. The Genetic Information Privacy Act is mentioned in Section 10 as a statute that serves as a carve-out. The AIDS Confidentiality Act, this court recognized in Rosenbach, appears to have served as a model for the Privacy Act with the person-agreed language. So the legislature knows how to use that term, protected health information. It didn't do it here. It used different terms under HIPAA. It used treatment, payment, or operations, and I've addressed what those mean under HIPAA. In conclusion, the healthcare exclusion makes sense. Biometrics have become the industry standard. That didn't happen in 2008. It happened over the last 15 years. But we believe the General Assembly foresaw that possibility and crafted the language in a way that allowed for it. The exclusion relieves hospitals and their vendors who they're operating with under business associate agreements and under hand-in-glove knowing what the regulations are It allows them to focus on patient care, safety, innovation, and delivering healthcare efficiently and at reduced cost. The limited legislative history that we have supports this. The plain language of the statute supports this. And we ask that you reverse the appellate court and answer the certified question, yes, applying the statute as written. Thank you very much, Counsel. Thank you. Thank you. Counsel to the appellate. Good morning. May it please the court. My name is Jim Zuras, and I represent the plaintiff appellees Jana Mazia and Lucille Mosby. The defendant claims that it is effectively exempt from the act any time it collects biometric data from anyone globally for operations. So not just when they collect biometric data from a patient for which there are good reasons to exclude, but limitlessly for, again, operations for which there is no good reason to exclude. If the defendant is correct, that means the General Assembly decided that as much as 10 percent of the Illinois workforce should have no biometric privacy protection whatsoever, simply by virtue of working in the healthcare field. It would also mean that the legislature intended to grant the healthcare field special treatment and relieve them from any duty whatsoever to safeguard worker biometric data and to oppose no restrictions on its use, its storage, its sale, or anything else, and all for no reason articulated or otherwise. There are specific exemptions in the statute in Section 25, but the healthcare field is not one of them. The defendant essentially is saying that healthcare worker biometric data is excluded from the definition of biometric identifiers in the statute. But as the appellate court, the two trial courts separately, and almost every other trial court to hear this issue have concluded that simply was not the legislature's intent, and there are three main reasons. First, the plain meaning of the statutory language at issue itself clearly manifests an intent to limit this exclusion to patient data. The defendant's construction requires a very forced, unnatural reading of the plain text. And finally, the defendant's interpretation would leave workers without any biometric protection under this Act, under HIPAA, or any other statute for no reason. Because, of course, HIPAA has nothing to do with worker data. HIPAA has nothing to do with the rights of employees or the duties of employers. The text, the structure, and the context of the statute as a whole lead us to the conclusion that this language here is intended to apply to patient data only. We agree the statutory language is very important, and we've talked about this. The critical modifier under HIPAA is ordinary meaning, first order of business in interpreting the statute. Well, what does that mean? Well, the only information that is ever under HIPAA is health-related patient information. There is no such thing as information under HIPAA that is not patient information. It does not exist. There is no dispute that the purpose of HIPAA is to protect patients. It is to protect their data. The purpose of HIPAA is to regulate health care, not globally for any activities they may engage in, operations, treatment, and what have you. It is to regulate that industry, cover entities, when using patient data. And there... Wouldn't that include the information that is collected from the opening and getting into the med trays and the how, the when, who that person was? Isn't that included in those medical records? You know, which employee accessed those, at what time, to what medications, to what patient? And that becomes part of their medical... So, I mean, it isn't just that person, the patient's information, but it does also include the information from the health care worker. Well, HIPAA does not protect that information, Your Honor, that you had just articulated. So this is the biometric data. This is the fingerprint of a worker. That fingerprint, that biometric data, is not protected by HIPAA. And there is no dispute about this, that HIPAA only covers patient data, and it does not cover worker data. And that is by regulation of HIPAA, as interpreted by the case law, that that statute, the HIPAA statute, simply does not cover the worker data. And it is the worker data that we are talking about here today. But is that what's required, counsel? I mean, when you look at the language of the statute,  It doesn't talk about what's covered under HIPAA. It talks about under HIPAA. That is the important language. And there is nothing that is ever under HIPAA. There is no reason to consult HIPAA. HIPAA does not have anything to do with anything other than patient data. So it didn't use the language here. It does not use a word, a phrase, for example, like, as defined by, as the legislature chose to use immediately above this when it was talking about the Anatomical Gift Act. There is specific language. We're excluding information as defined by that act. So the legislature knew how to use specific phrases when it wanted to. Here, there is a deliberate statement under HIPAA. HIPAA does not regulate any data collection or use activities unless it is patient data. So the only reasonable reading of this particular exclusion is that it was intended to apply to patient biometric information. Now, the plain text tells us... And what about the term health care treatment? For health care treatment under HIPAA. So reading these statutes, biometric identifiers do not include biometric, I'm sorry, do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment under HIPAA. So that information is not something that could be for treatment under HIPAA, under HIPAA now, because nothing is done under HIPAA when it comes to anything other than patient data. There is not a single example that we've ever heard in the filings or from counsel here today where activities that they are talking about, the examples, have to do, and it's governed by HIPAA, any example where it has to do with worker data of any kind. They can come up with a lot of examples where they're talking about activities vis-a-vis patient data, which of course is covered by HIPAA. It's protected by HIPAA. So there's biometric privacy protection for patients. That's understandable to exclude that, but the idea that the General Assembly arbitrarily decided to exclude as much as 10% of the workforce from any biometric privacy protection, first on its face, doesn't seem to make a lot of sense for no reason, but also to do it without articulating any reason why, again, does not make any sense. Why send the reader to a statute if that's really their intent, that has nothing to do with employer duties or employee's rights? It simply isn't adding up. There are statutes, of course, that do talk about employee rights, that talk about employee data and employer's obligations. They didn't send them to that. They sent them to HIPAA, which again only was enacted, the very purpose of HIPAA. It was enacted to protect patient data exclusively, and it has never been interpreted to protect any data of anyone else at any time because it does not. So it is not... I'm sorry. Why is there even this arguably second provision? You've got the ordinance. Why don't we... I guess you're just arguing to stop the first provision until you get to the order. I think... What meaning does the second provision have? Well, the defendant is telling us that these are two separate buckets now, two totally unrelated categories of data, category one, category two, and it's separated by OR. I say, we say, Your Honor, that this is an all-encompassing provision, the belt and suspenders approach to legislative drafting to ensure that patient data is covered, be it in a health care setting, for any reason, outside a health care setting, for any reason, if it's captured, as the appellate court pointed out, or if it's used, stored, for any of these purposes under HIPAA. So their interpretation doesn't result in these being two different buckets. The first part, from a patient, right? The second part, information collected for health care treatment, that's also from a patient. The second part, information collected for treatment under HIPAA, that's also from a patient. So to the extent they say that we have to have separate buckets, those aren't separate buckets that they've tried to set up. We say that it isn't crucial that we have totally separate, independent, unrelated data. This is all talking about patients, whether it's inside a health care setting, outside, and for whatever reason, whatever reason you're collecting it, it is excluded. And the structure of the statute also, you know, is very relevant here. I think the fact that they are focusing on this word or, in the middle of this, I think they are giving too much significance to that term. That is a term, and I counted 79 uses of that term in the statute, 21 in this definition, three in this sentence alone. You know, that's or is not a legal term. As the appellate court pointed out, the defendant is using it in the disjunctive sense sometimes, the conjunctive sense other times. It's inconsistent. Certainly, if we go back to what the purpose of the statute is and the structure and how it's set up, this is a informed consent regime. That is the teaching of this Court's Rosenbach decision. We have a statute that provides for informed consent. So simply getting informed consent from any subject of collection. Provide the person with information and get their consent. Why would the legislature say that in the middle of this definition now, of what a biometric identifier is, set up a scheme that excludes worker data from those basic obligations and the basic rights that they would have? It just does not make sense. If that was really the General Assembly's intent, all they would have to do is put a period after the word operations in this sentence here. Why add the HIPAA language? What is the purpose of under HIPAA in that statement? That is ultimately the issue that the defendant can't overcome. Because if that was simply for operations, under HIPAA or otherwise, whatever it is, you simply put a period there and you easily take care of it because it leads to the same result. Because whether it's for operations with a period there or under HIPAA, make no mistake about it, everything conceivably a hospital does would be for hospital operations or hospital treatment. And be it the doctor who is putting notes to chart on her computer. Be it for a maintenance person who is accessing the operations room. Be it for somebody accessing the parking lot. All those things are operations. If that's really what they had in mind, then they would simply say so. They didn't say... This language, the exemption language, has the word information used twice. You said a few times that the only thing HIPAA covers is patient data, patient information. So doesn't it seem as though biometric identifiers do not include information captured from a patient in a healthcare setting or information collected, used, or stored? Are you talking about two different things? No, Your Honor. We certainly don't believe so. For one thing, the information in the first part of this talks about captured. The second part is talking about collected, used, or stored. How is captured or collected any different? Well, I think those two words are very similar. I think the other words used or stored are different. And again, I think that is a deliberate reference to the fact that under HIPAA you can only consult that statute when you have a concern  of any kind from a worker. I'm sorry, from a patient and never a worker. That's right. This entire provision here is talking about patient information. Another clue we have is if we look at the data, the specific examples that are referenced right after this provision, we have things like MRI tests and CAT scans and other testing, things that can only be generated from a patient. No mention anywhere in here about any device, any employee, such as timekeeping systems or pharmaceutical dispensing systems or anything else that a worker might touch. If that was really what they had in mind, surely we would have had a manifested intent here in something better than in this very, very innocuous way that the defendant gets to its preferred conclusion. And fundamentally, the ultimate reason, if it's a close call on what this is really meant to do, the defendant's interpretation indisputably defeats the purpose of the act because the purpose ultimately is to provide the greatest amount of biometric data protection to all Illinois citizens. No question their rationale would exclude healthcare workers from its protection any time it touches upon whatever they call operations. Time and time again, what the rationale could possibly be, and we don't have any answers. We know why biometric data of patients is excluded. That makes sense. There's a legal reason and a practical one. The legal reason is that their data is already protected under HIPAA. The practical one is that it doesn't make sense to get informed consent from an unconscious patient, somebody that needs urgent care and so forth. Under the defendant's view, these folks would be left with no biometric protection of any kind, not under this statute and not under any statute. They simply would have no protection. There is no logical reason for that. And that result would happen despite how easy it is to get informed consent from workers. The facilities are already set up. They have robust systems in place in order to get informed consent in other contexts. They can easily get consent. Most entities today do so, and there is no explanation why they should not have to do so here. This is no burden. This is no expense. And that result is most consistent with the fundamental purpose of the act. Again, we ask them, well, what could be for hospital operations under HIPAA when it comes to worker data? There is no example. It does not exist. There is no such thing as anything happening under HIPAA or any activities regulated or governed under HIPAA unless it concerns patient data. It simply does not exist. And the defendant's result would result in effect to a wholesale exclusion for HIPAA-covered entities, and that simply could not have been the intent of the legislature, be it through this text, be it through the structure of the act, the context of the act, or the fact that it would essentially annihilate the fundamental purpose of the act, which is to provide the greatest amount of biometric privacy protection to all. So that the General Assembly intended to exclude only patient data is the only reasonable reading area of the text, which talks only about patient information. It is supported by the context and the structure of the act as a whole, and it aligns with the fundamental goal of the act, which is to provide the greatest amount of biometric privacy protection to Illinois citizens. So unless the Court has any additional questions, we would request that Your Honor affirm the appellate court's decision. Thank you so much. Thank you. Counsels for the appellant will be splitting their time for rebuttal, five minutes each. Counsel, can I ask you a question right off the bat here? So opposing counsel mentioned timekeeping, for example. Are you arguing that there's a blanket exemption for health care workers even if the collection was for timekeeping purposes? We are not advocating for a broad industry-wide exemption that would be used in the health care industry. We are arguing that the legislature gave us a very carefully and thoughtfully crafted exclusion only when information is collected, used, or stored for health care treatment, payment, or operations, as those terms are defined by HIPAA. Now, the context of this case, as we've noted earlier, is health care workers' use of automated dispensing cabinets to access medications and medical supplies to treat patients. So I think the use case at issue here is clearly health care treatment under HIPAA. It's not a close case. In terms of cases raising other fact patterns, we think that the trial courts of Illinois are more than capable to apply this court's decision and determine whether a particular use case fits within health care treatment, payment, or operations under HIPAA. I think some of the examples of janitorial services, parking lot attendance, those seem far-fetched to me. I don't think that the trial courts of Illinois are going to have a difficult time determining whether someone manning the parking lot is engaged in health care treatment, payment, or operations under HIPAA. I think other applications, such as a health care worker's use of a timekeeping system, could be a closer call. It's something that should be discussed based on a record and a case that raises that issue. But neither of these two consolidated cases on appeal do raise that issue. Something that was notable, both in the briefing here and in Mr. Zuris' argument, is that the focus of the plaintiffs in these cases has never been on the language of the statute. They're arguing about purported policy considerations. They're arguing extensively about a different statute. But what we're here today to interpret is the scope of the Privacy Act. And this court has said repeatedly in its earlier Privacy Act cases that the court's role is to give effect to the language that the legislature gave us, and that the best indication of legislative intent is the language that the legislature used in drafting the statute. In order to reach the sentence that we're proposing, where this entire sentence is limited only to information captured from a patient, the court would need to pick up its pen and judicially amend the Privacy Act to strike out the entire second half of that sentence. The court would need to begin not with the language of the act, but instead with a presumption that the legislature did not actually mean what it said. The court would have to assume that the phrase was meaningless, that the word or is not disjunctive, that under HIPAA is more akin to under the sunny skies than it is to under the terms of a contract, that the phrase under HIPAA should modify the entire sentence, even though there's no rule of construction or English grammar that would allow it to apply to portions of a sentence where it's separated by multiple other prepositional phrases, a second occurrence of the word information, and the word or. The court would have to assume that the word for in the health care exclusion doesn't denote purpose. The court would have to take the word patient that appears only in the patient data exclusion and graft it on to the second health care exclusion. That's what the court would have to do to reach the outcome that plaintiffs are advocating. The interpretation that we are proposing gives effect to the language that the legislature gave us. Health care workers' use of automated dispensing cabinets to access medications to treat patients is health care treatment. Thank you. Counsel? I would encourage the court to look at where we started and look at where opposing counsel started. We started with the text. We want to talk about the text. We want to talk about this unique language that the General Assembly chose. Counsel said,   of the sentence? What it's doing is it's explaining what's going on in the sentence. It's explaining and it's modifying treatment payment or operations. And operations is not an unlimited catch-all. It's defined in section 164.501 of HIPAA and it includes patient safety activities. This is not an attempt to create some kind of unlimited carve-out. It's a request for the court to apply the statute as written and we have explained the rationale for the statute. We have explained the language of the statute and why it supports our reading. The Privacy Act has significant force. This court has recognized that repeatedly. In the General Assembly, I think we can surmise understood that when it created the private right of action, the statutory damages, the fee-shifting provisions. And in that understanding, it did create specific carve-outs for certain activities, for certain information regulated under other statutes, and in section 25 for certain industries. It's created a carve-out for financial institutions regulated by the Graham-Beech-Bliley Act that is way broader than what the Graham-Beech-Bliley Act actually regulates. It covers all financial institutions under the Privacy Act. The Graham-Beech-Bliley Act would not regulate employee data, but the legislature crafted that in section 25. Here, the exclusion is not as broad but it's still there. It's for healthcare, treatment, payment, or operations under HIPAA. Our reading is the only reasonable reading of that language. It's the only reading that gives effect to every word in the sentence. Mr. Zurs's reading, he said, just is belt and suspenders. It's a redundancy. This Court has instructed over and over again in the Baskerville case and other cases cited in our brief, we should not read statutes that way. You need to give every word in the statute force and meaning and effectuate the General Assembly's intent when it chose these words. It chose these words for a meaning and the reason is to allow for innovation, allow the healthcare industry to use this type of technology for healthcare, treatment, payment, or operations. That's what this case is about. It's about the use of automated dispensing cabinets to check patient records, administer medications, and track the administration of medications. It's not about the janitor using a time clock. It's not about the guy in the parking lot. This Court is the Court of Last Resort. This Court is going to instruct the lower courts how to handle those cases and they are very capable of handling those cases and I don't think we're going to see the parade of horribles that Mr. Zurs offers. Thank you very much for your time today. We ask that you take your seats and answer the certified question. Thank you. Thank you very much all sides, all attorneys, for your spirit and evidence. This case, Agenda No. 22, No. 129081, Usil Moseley v. Ingalls Memorial Hospital, will be taken under review. Thank you.